UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
SymQuest GROUP, INC.,

                         Plaintiff,

       -against-

CANON U.S.A., INC.,

                         Defendant.
------------------------------------------------------------X

MEMORANDUM AND ORDER

CV 15-4200

(Wexler, J.)

APPEARANCES:

    GIBBONS P.C.
    BY:   Philip W. Crawford, Esq.
            Robert C. Brady, Esq.
            Christopher T. Basilo, Esq.
            Kevin W. Weber, Esq.
    Attorneys for Plaintiff
    One Pennsylvania Plaza, 37th Floor
    New York, NY 10119

    DORSEY & WHITNEY LLP
    BY:   Richard H. Silberberg, Esq.
            Christopher George Karagheuzoff, Esq.
            Dai Wai Chin Feman, Esq.
    Attorneys for Defendant
    51 West 52nd Street
    New York, NY 10019

WEXLER, District Judge:

       This diversity action was commenced by the Plaintiff, SymQuest Group, Inc. ("SymQuest"), against the Defendant, Canon U.S.A., Inc. ("Canon"), on July 17, 2015, alleging a number of claims arising from Canon's termination of its Office Imaging Retail Dealer

-1-

Agreement with SymQuest due to SymQuest's change in ownership. After being denied both a temporary restraining order and a preliminary injunction, SymQuest amended its Complaint on September 30, 2015.

Before the Court is Canon's motion to dismiss all but one claim in SymQuest's First Amended Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). SymQuest opposes the motion. For the following reasons, Canon's partial motion to dismiss is granted in its entirety.

BACKGROUND

SymQuest is a full-service office imaging equipment distributor that designs, installs and supports various business technologies pertaining to the flow of information of both electronic and physical communications. (1st Am. Compl. ¶ 1.) Canon is one of the largest manufacturers and distributors of office imaging equipment in the United States, whose products consist primarily of multi-function printers, standard printers, copiers and scanners. (Id. ¶ 5.)

In 1996, SymQuest became a Canon dealer, selling various types of office imaging equipment distributed by Canon. (Id. ¶ 7.) The relationship was not exclusive and since at least 1999, SymQuest has sold products manufactured by Canon's direct competitors as well. (Id.)

On or about February 26, 1999, SymQuest and Canon entered into an "Office Imaging Retail Dealer Agreement" (the "Dealer Agreement"), pursuant to which Canon would sell to SymQuest Canon-brand office equipment and SymQuest would resell that equipment and thereafter perform warranty and service work on that equipment for the end-user. (Id. ¶¶ 11-12.) Pursuant to the Dealer Agreement, SymQuest also agreed to purchase accessories, supplies and

spare parts from Canon. (Id. ¶ 13.) The designation as an authorized dealer provided SymQuest with preferential pricing terms and other benefits from Canon. (Id. ¶ 14.)

Under the terms of the Dealer Agreement, SymQuest was required to conduct business and service operations only from authorized sales and service locations, as designated by Canon. (Id. ¶ 15.) The Dealer Agreement also obligated SymQuest to use its best efforts to promote and market Canon-brand office imaging products, including any accessories, supplies and spare parts. (Id. ¶ 16.) SymQuest was further required to maintain a satisfactory inventory of product models and to maintain and operate fully staffed and stocked sales locations. (Id.)

Pursuant to the Dealer Agreement, SymQuest was not permitted to sell any product unless it was able to provide services following the sale of said product. (Id. ¶ 17.) In connection with this requirement, the Dealer Agreement obligated SymQuest to provide a full range of repair equipment for all products that it sold. (Id. ¶ 18.) The Dealer Agreement further required SymQuest to provide Canon original equipment manufacturer ("OEM") parts and supplies to end-users to whom it sold Canon copiers. (Id. ¶ 19.)

The Dealer Agreement also imposed various obligations upon SymQuest with respect to service and maintenance of the Canon-brand products that SymQuest sold. For example, SymQuest was required, at its own expense, to create and maintain a "Service Organization" for the installation, maintenance and repair of Canon products at each authorized location by employing competent service-trained technicians and maintaining an adequate inventory of parts and supplies. (Id. ¶¶ 20-21.) The Dealer Agreement required SymQuest to service Canon end-users within four hours of a customer's request. (Id. ¶ 22.)

To fulfill its service and maintenance obligations, SymQuest entered into Maintenance

Agreements with its customers that lease or purchase Canon products. (Id. ¶ 24.) The Maintenance Agreements are typically for a five-year term and were negotiated based on SymQuest's belief that it would have access to all of the supplies, software and information needed to service Canon products. (Id. ¶¶ 25-26.) SymQuest completes approximately 25,000 service calls per year, of which approximately 14,000 are for Canon products. (Id. ¶ 29.)

In early 2015, SymQuest sought new investors and invited Canon, Xerox, Konica Minolta Business Solutions U.S.A., Inc. ("Konica Minolta") and Kyocera, as well as two private equity firms, to submit formal offers by March 11, 2015. (Id. ¶ 44.) Canon did not make an offer to invest in SymQuest. (Id.) At its Board of Directors meeting on June 1, 2015, SymQuest approved the bid submitted by Konica Minolta for the purchase of 100% of SymQuest's stock, although SymQuest would remain a separate corporate entity. (Id.) SymQuest advised Canon of the stock purchase on June 2, 2015. (Id.)

By letter dated June 9, 2015, Canon terminated the Dealer Agreement, effective immediately. (Id. ¶¶ 45-46.) The termination letter advised SymQuest that it must cease using Canon's name and any reference to its status as an authorized dealer, as well as return all demonstration and loaner equipment, copies of price lists, promotional literature and technical information. (Id. ¶ 46.) The termination letter went on to state that SymQuest would have a one-time opportunity to purchase Canon brand equipment on June 12, 2015 and would thereafter no longer be able to purchase any new equipment from Canon. (Id.) Finally, SymQuest was advised that it would have a one-time opportunity to purchase Canon-brand spare parts and supplies on June 26, 2015 and would thereafter no longer be able to purchase any more Canon-brand parts and supplies. (Id.) SymQuest was required to pay in cash for these one-time

purchase opportunities upon placement of the orders and no discounts or rebates were applicable. (Id.)

On June 11, 2015, Canon terminated SymQuest's access to its E-Support, which is Canon's dealer-only website for trained and authorized technicians. (Id. ¶ 47.) That same day, Canon terminated SymQuest's right of entry to several other related web portals, including Canon's License Management Site - where SymQuest activated licenses that it purchased and software already loaded on devices - and Canon's ImageWare Remote, which provides updates on customer's meter reads, equipment error codes and waste toner information. (Id. ¶ 48.)

After the parties participated in a contractually required mediation, Canon temporarily restored SymQuest's access to the web portals. (Id. ¶ 49.) However, at the close of business on July 14, 2015, Canon once again terminated SymQuest's access to E-Support, ImageWare Remote and Canon's License Management Site. (Id. ¶ 50.) Without access to Canon's web portals, SymQuest's ability to service its end-users of Canon products is seriously impaired. (Id. ¶ 51.)

SymQuest commenced the within action on July 17, 2015 with the filing of a Complaint and an Order to Show Cause requesting a preliminary injunction. By Report and Recommendation dated August 7, 2015, Magistrate Judge Locke recommended that SymQuest's application for a preliminary injunction be denied for failure to demonstrate both irreparable harm and a likelihood of success on the merits. After no objections were filed, the Court adopted Magistrate Locke's recommendation by Memorandum and Order dated August 25, 2015. On September 30, 2015, SymQuest amended its Complaint, alleging the following six causes of action: (1) breach of contract; (2) unjust enrichment; (3) breach of the implied covenant of good

faith and fair dealing; (4) tortious interference with contract; (5) tortious interference with business relations; and (6) unfair competition. Canon now moves to dismiss all but SymQuest's unjust enrichment claim.

DISCUSSION

I. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Facial plausibility" is achieved when the "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). As a general rule, the court is required to accept as true all of the allegations contained in the complaint. See Iqbal, 556 U.S. at 678; Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . are not entitled to the assumption of truth." Iqbal, 556 U.S. at 678-79 (citation omitted); see also Twombly, 555 U.S. at 555 (stating that the Court is "not bound to accept as true a legal conclusion couched as a factual allegation"). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," which state a claim for relief. Iqbal, 556 U.S. at 679. A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. Iqbal, 556 U.S. at 678 (quoting Twombly, 555 U.S. at 557).

II. Breach of Contract

To state a claim for breach of contract under New York law, a complaint must set forth the following elements: "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." Gutt v. Nassau Health Care Corp., No. 04CV57, 2005 U.S. Dist. LEXIS 38775, at *15 (E.D.N.Y. Mar. 15, 2005) (quoting First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998)). At first blush, SymQuest's Complaint clearly sets forth these elements. The issue that Canon advances in its motion to dismiss, however, is that in terminating its Dealer Agreement, and declining to continue providing service support to SymQuest, Canon was merely exercising its legitimate contractual rights, as set forth in the Dealer Agreement. SymQuest disagrees and argues that the contract language is ambiguous.

"Under New York law, 'the initial interpretation of a contract is a matter of law for the court to decide.'" Maniolos v. United States, 741 F. Supp. 2d 555, 566 (S.D.N.Y. 2010) (quoting Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998)) (additional citations omitted). Such an interpretation includes whether or not the terms of the contract are ambiguous. See Maniolos, 741 F. Supp. 2d at 566; see also W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990) ("Whether or not a writing is ambiguous is a question of law to be resolved by the courts.").

"Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss." Maniolos, 741 F. Supp. 2d at 567 (collecting cases). Where the language of a contract is ambiguous, however, "its construction presents a question of fact, which of course precludes summary dismissal." Crowley v. VisionMaker, LLC, 512 F. Supp. 2d 144, 152 (S.D.N.Y. 2007).

A contract's language is considered ambiguous "if it is reasonably susceptible to more than one meaning." Maniolos, 741 F. Supp. 2d at 567 (citing Chimart Assoc. v. Paul, 66 N.Y.2d 570, 573 (1986)) (additional citations omitted). Conversely, a contract is deemed unambiguous if it has a "definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion." Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (citation omitted). Contract language "is not made ambiguous simply because the parties [to the litigation] urge different interpretations." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 598 (2d Cir. 2005).

In determining the within motion, the Court has reviewed the underlying Dealer Agreement, which is attached to the First Amended Complaint as an exhibit. See Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005) ("In determining the adequacy of the complaint, the court may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint."). After such review, the Court determines that, despite SymQuest's arguments to the contrary, the language set forth in the Dealer Agreement is clear and unambiguous.

Pursuant to the Dealer Agreement, Canon had the right to terminate the Agreement "prior to the expiration of its initial terms or of any renewal term . . . if there is a change in the management or control of [SymQuest] which is unacceptable to Canon USA in its sole discretion." (Dealer Agreement § 14.2.2.) Under the plain language of the Agreement, Canon's June 9, 2015 letter terminating SymQuest's Dealer Agreement due to its acquisition by Konica Minolta was clearly within Canon's contractual rights. Accordingly, SymQuest fails to state a

claim for breach of contract on this ground.

With respect to Canon's purported breach for declining to continue providing service support to SymQuest, the Dealer Agreement provides as follows:

> [SymQuest's obligations under paragraph 3.1 above [pertaining to SymQuest's service obligations] shall survive the termination of this Agreement as to Products sold or rented by it pursuant to this Agreement . . . . For so long as such obligations shall survive, Canon USA shall sell to [SymQuest] . . . spare parts and service tools as Canon USA deems necessary for [SymQuest] to perform such service obligations. [SymQuest's] obligations to service such Products, and its authorization under this paragraph 14.5 to perform such servicing, may be terminated at any time by Canon USA in its sole discretion upon written notice to [SymQuest], and Canon USA may then notify [SymQuest's] end-user customers of alternative authorized service facilities.

(Dealer Agreement § 14.5.)

Again, the plain language of the Dealer Agreement grants Canon the sole discretion to terminate SymQuests's authorization to continue servicing Canon products. The June 9, 2015 letter terminating SymQuest's Dealer Agreement also advised SymQuest that "Canon USA shall cease its sale to SymQuest of Canon-brand business equipment and accessories, and spare parts and supplies for each equipment . . . effective immediately." (1st Am. Compl. Ex. B at 2.) Since the right to terminate such sales, and SymQuest's corresponding authorization to perform service for end-users of Canon-brand products, was solely within Canon's discretion, the refusal to continue to sell SymQuest parts and to provide technical support cannot constitute a breach of the Dealer Agreement.

SymQuest argues that the language contained in Paragraph 14.5 of the Dealer Agreement is ambiguous because the first section states that SymQuest's obligations to service its end-users

"shall survive the termination" of the Agreement and that "[f]or so long as such obligations shall survive," Canon shall continue to sell SymQuest spare parts and service tools. (Dealer Agreement § 14.5.) As set forth above, the Agreement then goes on to state that Symquest's "obligations to service such Products, and its authorization . . . to perform such servicing, may be terminated at any time by Canon USA in its sole discretion . . . ." (Id.) According to SymQuest, although this latter language allows for SymQuest's obligations to be terminated, it does not address SymQuest's "right" to continue to purchase spare parts and service tools. (Pl. Mem. in Opp'n 7.) SymQuest's interpretation of Paragraph 14.5 is that "even if [SymQuest] is terminated and even if its service 'obligations' are relieved, . . . if [SymQuest] so desires, Canon shall still sell [SymQuest] products for [SymQuest] to service its machines in the field." (Id. at 8.)

The Court disagrees with SymQuest's interpretation. It is clear from the language in the Dealer Agreement that SymQuest's authorization to service Canon-brand products is exclusively within Canon's discretion. Only if Canon authorized SymQuest to continue to perform servicing after termination of the Dealer Agreement would it then be obligated to continue to sell SymQuest spare parts and service tools. Canon's June 9, 2015 letter clearly advised SymQuest that, in addition to terminating the Dealer Agreement, Canon was declining to continue to have SymQuest perform its service functions. Accordingly, once Canon terminated SymQuest's service authorization, it was no longer obligated to sell SymQuest spare parts and service tools. There is nothing ambiguous about the language contained in the Dealer Agreement.

Based on the foregoing, SymQuest's First Amended Complaint fails to state a claim for breach of contract. Canon's motion to dismiss is granted with respect to this claim.

III.  Breach of the Covenant of Good Faith and Fair Dealing

"Under New York law, the implied covenant of good faith and fair dealing inheres in every contract." House of Diamonds v. Borgioni, LLC, 737 F. Supp. 2d 162, 170 (S.D.N.Y. 2010) (citation omitted). As such, a breach of that duty is "merely a breach of the underlying contract." Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013) (quotation omitted). Where, as here, "a breach of contract claim, based upon the same facts, is also pled," New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing." Id. (citation omitted). Accordingly, "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." Id. (citing L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 434 n.17 (2d Cir. 2011)).

SymQuest argues that its claim for breach of the implied covenant of good faith and fair dealing is not duplicative of its breach of contract claim because it has alleged bad faith on Canon's part. Specifically, SymQuest asserts that Canon's actions in refusing to provide SymQuest with post-termination support services were malevolent and done with the specific intention of harming SymQuest. (Pl. Mem. of Law in Opp'n 9.) However, as this Court has previously found, bad faith in connection with a breach of contract claim does not provide an independent basis for recovery." Avazpour Networking Servs. v. Falconstar Software, Inc., 937 F. Supp. 2d 355, 365 (E.D.N.Y. 2013) (citing Quail Ridge Assoc. v. Chemical Bank, 558 N.Y.S.2d 655, 657 (3d Dep't 1990)). Rather, a claim for breach of the implied covenant of good faith and fair dealing "can survive a motion to dismiss only if it is based on allegations different than those underlying the accompanying breach of contract claim." ARI & Co., Inc. v. Regent

Int'l Corp., 273 F. Supp. 2d 518, 522 (S.D.N.Y. 2003) (citation and internal quotation marks omitted). Here, the same allegations underlie both SymQuest's breach of contract claim and its claim for breach of the implied covenant of good faith and fair dealing - i.e., that Canon failed to provide SymQuest with post-termination support services. Accordingly, the claim for breach of the implied covenant of good faith and fair dealing must be dismissed as duplicative of SymQuest's breach of contract claim.

In addition, to state an independent claim for breach of the implied covenant of good faith and fair dealing, "the plaintiff must allege facts which tend to show that defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." House of Diamonds, 737 F. Supp. 2d at 169. As the Court has already found, Canon was within its contractual rights in declining to continue providing SymQuest with spare parts and service tools after the termination of SymQuest's Dealer Agreement. Therefore, Canon's exercise of its legitimate contractual rights cannot have breached any implied duty. See In Touch Concepts, Inc. v. Cellco P'ship, 788 F.3d 98, 102 (2d Cir. 2015) ("Under New York law, the implied covenant of good faith and fair dealing cannot be used to impose an obligation that is inconsistent with express contractual terms."); LJL 33rd St. Assoc., LLC v. Pitcairn Props., Inc., 725 F.3d 184, 195 (2d Cir. 2013) ("[T]he implied covenant of good faith cannot create duties that negate explicit rights under a contract."). This provides another basis for dismissal of SymQuest's claim for breach of the implied covenant of good faith and fair dealing.

Accordingly, Canon's motion to dismiss is granted with respect to the claim for breach of the implied covenant of good faith and fair dealing.

IV. Tortious Interference with Contract

To state a claim of tortious interference with contract under New York law, a plaintiff must demonstrate "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." Semper v. N.Y. Methodist Hosp., 786 F. Supp. 2d 566, 583 (E.D.N.Y. 2011) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996)). As a rule, "conclusory allegations of interference with an unspecified contract are insufficient to plead tortious interference." Lesesne v. Brimecome, 918 F. Supp. 2d 221, 227 (E.D.N.Y. 2013) (collecting cases); 57th St. Arts, LLC v. Calvary Baptist Church, 861 N.Y.S.2d 946, 946 (1st Dep't 2008) ("Conclusory assertions of wrongful, intentional, malicious or improper actions, for personal profit or constituting independent torts, are inadequate to spell out a claim . . . for tortious interference with contract.").

SymQuest alleges that it "is a party to thousands of valid contracts with end users of Canon [products] to service and support Canon [products]" and that Canon is aware of those contracts. (1st Am. Compl. ¶¶ 103-05.) According to SymQuest, by ceasing to provide SymQuest with spare parts and service tools, Canon is "intentionally and unjustifiably rendering SymQuest's performance of its obligations under those contracts with end-users impossible and therefore causing SymQuest to breach third-party contracts." (Id. ¶ 106.) SymQuest further alleges that "[b]y contacting SymQuest's end-user customers and misleading them into believing that SymQuest will be unable to perform its obligations under [those] contracts . . ., Canon is intentionally and unjustifiably inducing SymQuest's customers to terminate their [contracts] with

SymQuest." (Id. ¶ 107.) Finally, SymQuest alleges that if Canon does not continue to provide spare parts and service tools, SymQuest "may become unable to perform its obligations under its contracts with end-user customers . . ., causing those [contracts] to be breached." (Id. ¶ 108.)

First, SymQuest does not allege that any of its end-users have actually breached their contracts. The very elements of the claim require "actual breach of the contract." Lama Holding Co., 88 N.Y. 2d at 424. Accordingly, SymQuest's allegations are merely speculative at this point.

Moreover, SymQuest does not allege that any of its end-users breached their contracts, but rather that SymQuest will breach or has breached its contracts with third parties as a result of Canon's alleged breach of its contract with SymQuest. Such allegations are insufficient. See Plasticware, LLP v. Flint Hill Res., LP, 852 F. Supp. 2d 398, 405 (S.D.N.Y. 2012) (citing cases).

Finally, SymQuest argues that by contacting its end-users, Canon is inducing end-users to breach their contracts with SymQuest. However, Paragraph 14.5 of the Dealer Agreement states that, once Canon chooses to terminate the Agreement, it "may then notify [SymQuest's] end-user customers of alternative authorized service facilities." (Dealer Agreement § 14.5.) "[T]he mere exercise of contract rights . . . is insufficient to give rise to a tortious interference claim, because exercising contract rights does not constitute bad faith, a required element of a tortious interference claim." 4 Hour Wireless v. Smith, No. 01 Civ. 9133, 2002 WL 31654963, at *2 (S.D.N.Y. Nov. 22, 2002) (citing Chrysler Credit Corp. v. Dioguardi Jeep Eagle, Inc., 596 N.Y.S.2d 230 (4th Dep't 1993)). Contacting SymQuest's end-users is clearly authorized by the parties' Dealer Agreement. Accordingly, Canon cannot be liable for tortious interference with contract for exercising its contractual rights.

Based on the foregoing, Canon's motion to dismiss is granted with respect to SymQuest's tortious interference with contract claim.

V.   Tortious Interference with Business Relations

To state a claim for tortious interference with business relations under New York law, SymQuest must allege that: "(1) [it] had business relations with a third party; (2) [Canon] interfered with those business relations; (3) [Canon] acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) [Canon's] acts injured the relationship." Plasticware, LLC, 852 F. Supp. 2d at 402 (quoting Catskill Dev., LLC v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008)). "[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." Carvel Corp. v. Noonan, 3 N.Y.3d 182, 192 (2004).

SymQuest alleges that Canon's decision to cease providing it with spare parts and service tools was done "for the sole purpose of harming SymQuest by destroying its business relationships with its end-user customers." (1st Am. Compl. ¶ 114.) According to SymQuest, "Canon's conduct is in bad faith," and "Canon's sole goal is to inflict harm on SymQuest." (Id. ¶¶ 116-17.) Finally, SymQuest alleges that "Canon's purpose is to draw such business away from SymQuest and to Canon itself, or to another preferred Canon dealer." (Id. ¶ 115.)

Putting aside the conclusory nature of SymQuest's allegations, which are insufficient to state a claim in and of themselves, SymQuest's tortious interference with business relations claim also fails for failure to demonstrate that Canon "acted for a wrongful purpose or used dishonest,

unfair or improper means." Catskill Dev., 547 F.3d at 132. As the Second Circuit has observed, the "wrongful means" element of a tortious interference with business relations claim "sets a high bar." 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 262 (2d Cir. 2015). "Unlike a claim for tortious interference with contract, which requires a plaintiff to show no more than that the defendant intentionally and without justification procured a breach of a valid contract of which he was aware, . . . a claim for tortious interference with business relations requires a plaintiff to show, 'as a general rule,' that 'the defendant's conduct . . . amount[ed] to a crime or an independent tort.'" Id. (quoting Carvel, 3 N.Y.3d at 190) (internal citation omitted).

While New York courts have recognized an exception to this rule "where a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs,'" the exception is a narrow one. Carvel, 3 N.Y.3d at 190 (quoting NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc., 628 N.Y.S.2d 408 (3d Dep't 1995), aff'd, 87 N.Y.2d 614 (1996)). "When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate.'" 16 Case Duse, 791 F.3d at 262 (quoting Carvel, 3 N.Y.3d at 190).

Here, SymQuest fails to allege any criminal, tortious or other conduct by Canon within the meaning of Carvel and its progeny. Moreover, as with SymQuest's claim for tortious interference with contract, Canon's decision to terminate SymQuest's access to its spare parts and service tools, as well as Canon's actions in contacting SymQuest's end-users are well within Canon's contractual rights. Accordingly, SymQuest cannot demonstrate that Canon has acted within any impermissible purpose. Rather, Canon's actions are contractually permissible. As such, SymQuest fails to state a claim for tortious interference with business relations and

Canon's motion to dismiss is granted with respect to this claim

VI. <u>Unfair Competition</u>

Although SymQuest's First Amended Complaint contains a cause of action for unfair competition, which Canon herein seeks to dismiss, SymQuest failed to even address the claim in its opposition to Canon's motion. "A court 'may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed.'" <u>Martinez v. City of New York</u>, No. 11 Civ. 7461, 2012, U.S. Dist. LEXIS 173500, at *3 (S.D.N.Y. Dec. 6, 2012) (quoting <u>Lipton v. County of Orange</u>, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004)); <u>see also</u> <u>Robinson v. Fischer</u>, No. 09 Civ. 8882, 2010 U.S. Dist. LEXIS 137660, at *32 (S.D.N.Y. Dec. 29, 2010) ("Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim.").

Here, SymQuest, who is represented by counsel, does not even mention its unfair competition claim in its memorandum of law in opposition to Canon's motion to dismiss. The Court deems SymQuest's unfair competition claim abandoned and it is, accordingly, dismissed.

CONCLUSION

For the foregoing reasons, Canon's motion for partial dismissal is granted in its entirety and Counts One, Three, Four, Five and Six of SymQuest's First Amended Complaint are dismissed with prejudice. The parties are directed to contact the assigned Magistrate Judge forthwith to commence discovery on the sole remaining claim in this action.

**SO ORDERED:**

Dated: Central Islip, New York
      May 16, 2016

                                      s/ Leonard D. Wexler
                                  LEONARD D. WEXLER
                                  United States District Judge